**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| PROJECT CITIZENSHIP INC. | ) |
| Plaintiff, | ) |
| vs. | ) Case No. |
| DEPARTMENT OF HOMELAND SECURITY, CHAD WOLF, in his official capacity, KENNETH CUCCINELLI, in his official capacity, AND UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, | ) COMPLAINT FOR ) DECLARATORY AND ) INJUNCTIVE RELIEF ) ADMINISTRATIVE PROCEDURE |
| Defendants. | ) ACT CASE |

Plaintiff Project Citizenship brings this Complaint against Defendants Chad Wolf, in his official capacity as Acting Secretary of Homeland Security; the U.S. Department of Homeland Security ("DHS"); U.S. Citizenship and Immigration Services ("USCIS"), and Kenneth Cuccinelli, in his official capacity as Senior Official Performing the Duties of Director of USCIS (collectively, "Defendants").  In this action, Plaintiff seeks declaratory and injunctive relief barring implementation of an illegal USCIS rule – currently set to take effect on October 2, 2020 – that would prevent tens of thousands of eligible immigrants from becoming naturalized U.S. citizens. Plaintiff alleges as follows:

## I.   INTRODUCTION

1.      The naturalization process is regulated by USCIS and is the final step on the long road for "green card" holders, or Lawful Permanent Residents ("LPRs"), to apply for and obtain citizenship in the United States.  Immigrants who are eligible to complete the naturalization process are, by definition, individuals whom the government has found to be eligible for permanent resident status, who have shown a deep commitment to and love for this country, and who already have deep roots in their communities.

2.      Millions of immigrants are eligible to naturalize.  *See, e.g.*, U.S. Dep't of Homeland Sec., Office of Immigration Statistics, *Population Estimates: Lawful Permanent Resident Population in the United States: January 2015* 1 (May 2019), https://www.dhs.gov/sites/default/files/publications/lpr_population_estimates_january_2015.pdf (DHS estimated that 9 million LPRs in the United States were eligible to naturalize as of January 1, 2015).  To be eligible to naturalize, immigrants must meet criteria that Congress has determined demonstrates a commitment to this country:  good moral character; years of lawful permanent residence and physical presence; proficiency in the English language (in most cases); and an understanding of the nation's history and government.  None of these criteria concerns an individual's wealth.

3.      In exchange for demonstrating commitment through the aforementioned criteria, naturalized immigrants – new citizens – are granted the right to participate fully in American life. Citizens are able to vote, serve on juries, travel without restrictions, and run for political office. These are all enormous benefits without which full integration into American society is impossible. Additionally, citizens have access to better economic opportunities than LPRs, including government jobs and certain job-related security clearances, to the ultimate benefit of their communities and the United States as a whole.

4.      In addition, children who are LPRs who automatically derive citizenship from a U.S.-citizen parent ("Derivative Applicants," or, collectively with LPRs, "Applicants") rely upon USCIS to provide them with official documentation of their citizenship status.  Thus, LPRs pursuing the naturalization process can strengthen their family units by obtaining citizenship for Derivative Applicants and by petitioning to bring other family members to the United States.

5.      Fundamental to the naturalization process is the role of USCIS and its stated goal to "administer[] the nation's lawful immigration system, safeguarding its integrity and promise by efficiently and fairly adjudicating requests for immigration benefits while protecting Americans, securing the homeland, and honoring our values."  U.S. Dep't of Homeland Sec., *Citizenship and Immigration Services Overview*, https://www.dhs.gov/topic/overview (last visited Aug. 11, 2020).

6.      This case challenges an unlawful measure taken by Defendants that directly undermines this goal by severely limiting the ability of low-income LPRs to apply for naturalization and/or for Derivative Applicants to apply for a Certificate of Citizenship.  Currently, LPRs must pay a $725 fee with an Application for Naturalization, and Derivative Applicants must

pay a $1,170 fee with an Application for Certificate of Citizenship.  Since 2011, USCIS has maintained a policy of waiving these fees for Applicants who demonstrate one of the following: (1) receipt of a means-tested benefit, such as Medicaid, Supplemental Security Income ("SSI"), Supplemental Nutrition Assistance Program ("SNAP," formerly known as food stamps), or Temporary Assistance for Needy Families ("TANF"); (2) income at or below 150 percent of the Federal Poverty Guidelines; or (3) "financial hardship" evinced by extraordinary circumstances such as job loss or medical expenses.

7.      This fee waiver program has allowed hundreds of thousands of immigrants to begin the naturalization process despite having limited financial resources.  In 2017, nearly 40 percent of all naturalization applications included a fee waiver.  Studies show that fees are a substantial barrier to naturalization and that fee waivers lead to an increase in the number of naturalized citizens.

8.      Since its founding in 2014, Plaintiff Project Citizenship has specialized in helping permanent residents in Massachusetts and beyond overcome barriers to U.S. citizenship.  Each year, Project Citizenship is responsible for up to 5% of the total naturalization applications to the Boston and Lawrence, Massachusetts USCIS offices.  Project Citizenship's mission to ensure that all eligible immigrants understand and have access to the path to citizenship, regardless of their ability to pay, is directly reliant on the fee waiver program.

9.      Over the last six years alone, Project Citizenship has helped more than 7,965 LPRs apply for citizenship through its dedicated full-time staff, *pro bono* legal partners, and more than 1,000 trained volunteers.  Project Citizenship has a 95% success rate.  In its experience, Project Citizenship has found that the Application for Naturalization form ("Form N-400") is not straightforward and that clients benefit from legal advice and assistance.  Over 20% of Project Citizenship's clients have previously attempted to apply for, or applied unsuccessfully for, citizenship.  The majority of naturalization applications that Plaintiff submits on behalf of its clients are generated through naturalization workshops it hosts, which are highly streamlined, one-day events fueled primarily by volunteer labor.  Plaintiff carefully plans these workshops to maximize efficiency and to ensure its ability to assist as many individuals as possible with limited resources.  Workshops are one-stop shops for completing and submitting applications for eligible LPRs and Derivative Applicants, and Applicants are asked to bring all documentation required to

complete their naturalization or certificate application, including documentation supporting a fee waiver, if one is needed.

10.     On November 14, 2019, USCIS proposed changes to the established fee waiver qualifications and process that will go into effect on October 2, 2020 (the "2020 Rule"). The 2020 Rule will cripple the ability of low-income Applicants to apply for naturalization or to receive a Certificate of Citizenship in two critical ways.

11.     First, the 2020 Rule increases the application fee for citizenship applicants by nearly 83%, from $640 to $1,170. U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, 85 Fed. Reg. 46,788, 46,792 (Aug. 3, 2020) (to be codified at 8 C.F.R. pts. 103, 106, 204, 211-12, 214, 216-17, 223, 235-36, 240, 244-45, 245a, 248, 264, 274a, 286, 301, 319-20, 322, 324, 334, 341, 343a, 343b, 392). Applicants will receive a $10 discount for applying online, which still constitutes an application fee increase of over 81%. *Id.* at 46,792. N-400 applicants who previously would have qualified for the "reduced fee option . . . whose documented income is greater than 150 percent and not more than 200 percent of the Federal poverty level" will see their application fee rise from $320 to $1,170, a nearly 226% increase. *Id.* at 46,792 & n.8, 46,913.

12.     Second, the 2020 Rule removes the ability of the vast majority of Applicants to obtain a fee waiver for Form N-400 and Application of Certificate of Citizenship (for Derivative Applicants) ("Form N-600") submissions. *See id.* at 46,818, 46,790. Under the proposed rule, fee waivers would be limited to very specific groups of applicants including Violence Against Women Act self-petitioners, certain special immigrant juveniles and special immigrants, and select victims of trafficking, crime, or domestic violence. *See id.* at 46,790, 46,810, 46,812-13 (allowing for N-400 fee waivers for "requestors who meet the requirements of INA section 245(l)(7), 8 U.S.C. 1255(l)(7)," along with other specified groups of applicants); *see also* 8 U.S.C. § 1255(l)(7) (2018).

13.     By increasing the application fee and eliminating fee waivers for almost all applicants, USCIS eliminates access to naturalization for low-income immigrants and unduly burdens Applicants as well as providers of naturalization services, such as Plaintiff. In effect, this change constitutes a wealth test for citizenship, preventing large numbers of low-income LPRs from becoming citizens, and their LPR children from deriving citizenship, despite the fact that they otherwise qualify for citizenship in every way. Similarly, because the 2020 Rule removes the ability of Derivative Applicants to obtain fee waivers, eligible low-income Derivative Applicants

will be prevented from receiving certificates of citizenship, which are necessary to demonstrate their unquestionable status as U.S. citizens.

14.     Plaintiff will likewise experience harm if the rule goes into effect.  Plaintiff's mission is to ensure that all immigrants understand and have access to the path to citizenship, regardless of their ability to pay.  Plaintiff receives funding from a combination of grants and donations, many of which are tied to the number of individuals whom Plaintiff serves per year. Plaintiff also receives grants and donations because it serves low-income clients.  Approximately 73% of the individuals and families that Plaintiff serves apply for a fee waiver.  Immediately upon going into effect, the 2020 Rule will effectively revoke the ability of those Applicants to pursue naturalization as well as Plaintiff's ability to assist them in doing so.  In the long-term, it will drastically limit the number of future clients, especially low-income clients, that Plaintiff can assist, thus impinging upon Plaintiff's mission and jeopardizing Plaintiff's funding and, as a result, its very existence.

15.     While limiting the number of eligible individuals applying for citizenship appears to have been the underlying purpose of USCIS's rule change, the 2020 Rule is unlawful for three principal reasons.

16.     First, despite issuing substantive rule changes that affect the rights of individuals, Defendants failed to follow the notice-and-comment procedures required under the Administrative Procedure Act (the "APA").  Defendants failed to give interested persons a meaningful opportunity to participate in the rulemaking process.  Specifically, Defendants did not provide enough time for public comment.  Additionally, Defendants' response to the comments submitted in response to the 2020 Rule was wholly deficient.

17.      Second, the 2020 Rule violates the APA because Defendants' decision to make changes to the naturalization process is arbitrary and capricious.  *See* 5 U.S.C. § 706(2)(A) (2018). Defendants claim that raising the citizenship fee and eliminating fee waivers are necessary to cover "the full operating costs associated with administering the nation's lawful immigration system." 85 Fed. Reg. at 46,789.  Defendants further represent that citizenship fees have historically been heavily discounted, with costs of processing citizenship applications shifted to other fee payers, and that the proposed changes would shift fee policies from the "ability-to-pay" principle to the "beneficiary-pays" principle.  *See id.* at 46,799, 46,801.  But USCIS admits that the 2020 Rule "deviates from the beneficiary-pays principle to establish fees that do not represent the estimated

full cost of adjudication." *See id.* at 46,795.  Further, the agency's own numbers suggest that the proposed changes would result in Applicants paying for more than just the cost of processing their applications.  Applicants, therefore, will end up subsidizing the costs of processing other types of immigration benefits applications.  Moreover, USCIS's projections regarding the number and cost of future applications are not supported by the available evidence.

18.     Third, the 2020 Rule violates the Immigration and Nationality Act (the "INA") and is therefore "not in accordance with law."  *See* 5 U.S.C. § 706(2)(A).  The 2020 Rule violates sections 312 and 316 of the INA, which clearly enumerate the prerequisites for naturalization, *see* 8 U.S.C. §§ 1423, 1427 (2018), by creating a wealth requirement for citizenship.

19.     For these reasons and others, the Court should vacate the 2020 Rule, declare it unlawful, and enjoin Defendants from applying it.

## II.     JURISDICTION AND VENUE

20.     This Court has federal question jurisdiction under 28 U.S.C. § 1331 (2018) because this action arises under the APA and the INA.

21.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (e)(1) (2018).

## III.     PARTIES

### A.     Plaintiff

22.     Plaintiff Project Citizenship is a 501(c)(3) nonprofit organization headquartered in Boston, Massachusetts.  Its mission is to provide free, high-quality legal services to LPRs and Derivative Applicants in obtaining U.S. citizenship and certificates of citizenship, respectively. As a key part of that mission, Project Citizenship offers free workshops, eligibility screenings, application assistance, legal referrals, and all materials needed to apply for U.S. citizenship.

23.     Project Citizenship's work relies upon a network of volunteer attorneys, Department of Justice-accredited representatives, law students, and other trained volunteers.  With the assistance of approximately 1,005 volunteers, Project Citizenship held 64 workshops in 2019 alone, assisting 1,974 Applicants.

24.     In addition, Project Citizenship works collaboratively with community-based partners throughout New England to provide a range of support services, civics instruction, application assistance, and English for Speakers of Other Languages ("ESOL") classes.  As a result, Project Citizenship has helped thousands of LPRs with the naturalization process and Derivative Applicants with the certification process, in large part due to its extensive experience

with fee waiver applications.  Project Citizenship relies heavily upon the ability of its low-income clients to submit applications without substantial burden and unnecessary hardship.

**B.      Defendants**

25.      Defendant DHS is the executive department charged with authority over federal immigration law, *see* 6 U.S.C. § 251 (2018), and DHS is an "agency" within the meaning of the APA, *see* 5 U.S.C. § 551(1) (2018).

26.      Defendant Chad Wolf is the Acting Secretary of Homeland Security, 85 Fed. Reg. at 46,913, and is thus deemed the head of the agency with "direction, authority, and control over it."  *See* 6 U.S.C. § 112(a)(2) (2018).  Under the INA, he is "charged with the administration and enforcement of" the federal immigration and nationality laws.  8 U.S.C. § 1103(a)(1) (2018). Defendant Wolf is being sued in his official capacity.

27.      Defendant USCIS is a component of DHS, *see* 6 U.S.C. § 271 (2018), and an "agency" within the meaning of the APA, *see* 5 U.S.C. § 551(1).  USCIS is permitted to charge fees for naturalization services and to provide certain related services "without charge."  *See* 8 U.S.C. § 1356(m) (2018).  USCIS is the arm of DHS that issued the 2020 Rule.

28.      Defendant Kenneth R. Cuccinelli is the Senior Official Performing the Duties of Director of USCIS. 85 Fed. Reg. at 46,804.  Among the functions delegated to the USCIS Director is "establish[ing] the policies for performing" functions including "[a]djudications of naturalization petitions." 6 U.S.C. §§ 271(a)(3)(A), (b)(2).  Defendant Cuccinelli is being sued in his official capacity.

**IV.     SUBSTANTIVE ALLEGATIONS**

**A.      Naturalization**

**1.      The Benefits of Naturalization**

29.      The Constitution recognizes two pathways to citizenship: by birth and by naturalization.  U.S. Const. amend. XIV, § 1.  Recognizing the importance of having a clear process for immigrants to become citizens, the First United States Congress passed the country's first Naturalization Act in 1790, just one year after the Constitution went into effect.  1 Stat. 103.

30.      Since that time, the United States has always maintained a process by which immigrants who have made a permanent commitment to the United States can formalize that relationship by becoming citizens.  The United States has historically "exhibit[ed] extraordinary

hospitality to those who come to our country," with "[o]ne indication of this attitude [being] Congress' determination to make it relatively easy for immigrants to become naturalized citizens." *Foley v. Connelie*, 435 U.S. 291, 294 & n.2 (1978).

31.     To be eligible to naturalize under current law, most immigrants must:  (1) have been an LPR for five years; (2) be able to read, write, and speak basic English; (3) have a basic understanding of United States history and government; (4) be a person of good moral character; and (5) demonstrate an attachment to the principles and ideals of the United States Constitution. 8 U.S.C. §§ 1423, 1427.

32.     In addition, most LPRs must be able to show: (1) three months' residence in the state from which they are applying; (2) continuous residence in the United States for five years prior to applying for naturalization; and (3) "physical presence" in the United States for at least 30 months out of the five years before applying for citizenship.  8 U.S.C. § 1427.

33.     Among the chief benefits of citizenship are the rights to vote, apply for government jobs, run for elected office, and serve on a jury.  *See, e.g.*, U.S. Citizenship and Immigration Servs., M-476, *A Guide to Naturalization* 3 (rev. Nov. 2016), https://www.uscis.gov/sites/default/files/files/article/M-476.pdf.   Put simply, naturalization allows the full and free participation in this nation's democracy.

34.     There are additional tangible benefits only obtained once naturalized.  For example, while LPRs face restrictions on international travel, naturalized citizens do not, and they can travel internationally with U.S. passports.  *Id.*   Further, unlike LPRs, naturalized citizens cannot be deported.  Naturalized citizens are also eligible for state and federal government benefits that are not available to LPRs.

35.     Naturalization is also associated with substantial improvements in economic and professional opportunities, including access to jobs requiring high-level security clearance.  On average, naturalized citizens can see their earnings increase by eight to eleven percent.  *See* Manuel Pastor & Justin Scoggins, Ctr. for the Study of Immigrant Integration, *Citizen Gain: The Economic Benefits of Naturalization for Immigrants and the Economy* 1, 11 (Dec. 2012), https://dornsife.usc.edu/csii/citizen-gain/; *see also* María E. Enchautegui & Linda Giannarelli, Urban Inst., *The Economic Impact of Naturalization on Immigrants and Cities* 15 (Dec. 2015), https://www.urban.org/research/publication/economic-impact-naturalization-immigrants-and-cities/view/full_report ("[W]e find that naturalization increases the earnings of those eligible

to naturalize 8.9 percent . . . ."). Naturalization alone may result in a wage premium of at least five percent, even when controlling for education, language skills, work experience, and other factors that might otherwise explain a wage gap. *See* Madeleine Sumption & Sarah Flamm, *The Economic Value of Citizenship for Immigrants in the United States* 1 (Sept. 2012), https://www.migrationpolicy.org/research/economic-value-citizenship. Naturalized citizens are more likely to own their own homes and build assets.

36.     The economic benefits of naturalization are attributable, at least in part, to the fact that a naturalized citizen is better able to find the right job – including a highly skilled job – and to switch jobs if necessary. Naturalized citizens also have access to certain government jobs, and jobs in licensed professions that are not open to certain noncitizens. *See, e.g.*, 8 U.S.C. § 1621 (2018). Additionally, naturalized citizens experience less employment discrimination than noncitizens.

37.     The benefits of naturalization extend to the families of naturalized citizens. LPR children under the age of 18 living with their parents automatically become citizens once their parents naturalize. 8 U.S.C. § 1431(a) (2018). These Derivative Applicants are eligible to apply for a certificate of citizenship from the government that serves as tangible evidence of their citizenship status. Naturalized citizens, unlike LPRs, can also file immigration petitions to reunite with certain family members, such as parents, siblings, and married sons and daughters. *See* 8 U.S.C. §§ 1151(b)(2)(A)(i), 1153 (a)(1)-(4) (2018).

38.     When more individuals are eligible to, and do, participate in the political process, our government is stronger and tends to enact policies that more fully reflect the needs of the entire populace. By opening the door to political participation, naturalization helps to ensure that our representative government is truly representative.

## 2.     The Naturalization Application Process

39.     For LPRs seeking to become U.S. citizens, naturalization marks the final step in a long journey.

40.     An LPR begins the application process by filling out USCIS Form N-400, the naturalization application. This 20-page form requests detailed information, including information about the Applicant's residence, parents, marital history, children, employment and education, and travel outside the United States. It also asks more than 40 questions about the Applicant's moral

character and commitment to the United States; many of the questions have legal implications and are written at an advanced English level.

41.     After completing the form, an LPR must collect a number of required documents. Depending on an LPR's basis for eligibility, these can include, among other things, a Permanent Resident Card, marriage certificate, proof of a spouse's U.S. citizenship, and proof of termination of all prior marriages.  The LPR must mail these documents, together with the application form and fee, to a USCIS "Lockbox Facility."

42.     After the application is processed, LPRs are sent a letter with a date and location for a biometrics appointment.  When the date comes, the LPR travels to the location to be fingerprinted and photographed.  Afterward, the LPR waits to hear about their status and may be required to provide additional documents, or be fingerprinted again.

43.     Once the documents and biometrics are in order, USCIS schedules an interview for the Applicant, at which a USCIS officer asks detailed questions about the Applicant's background, residence, moral character, and allegiance to the United States.  The officer also administers an English test (unless the Applicant qualifies for an exemption) and a civics exam with questions about American politics and history.

44.     After the interview, the LPR waits to receive a decision.  The application is either denied, continued (in which case a second interview is scheduled or more documents are requested), or approved.  Approved LPRs attend a ceremony where they become American citizens after taking an oath to support and defend the Constitution and laws of this nation.

### 3.     Naturalization Application Fees and Fee Waivers

45.     Congress has authorized USCIS to collect fees to cover the costs of its operations, including any costs associated with processing immigration applications.  *See* 8 U.S.C. § 1356(m). Pursuant to that authority, USCIS has set the total fee for naturalization applications at $725.  The fee for Form N-600 is $1,170.

46.     For many low-income Applicants, the application fee is a major barrier to applying for naturalization or for a certificate of citizenship.  It can often mean the difference of being able to pay rent, secure food for their family, keep up with medical bills, and pay all the other expenses families incur on a daily basis.  Research and Plaintiff's own experience demonstrate that the application fee can preclude eligible LPRs from applying for citizenship.  *See, e.g.*, Jens Hainmueller et al., *A Randomized Controlled Design Reveals Barriers to Citizenship for Low-*

*Income Immigrants*, 115(5) Proceedings of the Nat'l Acad. of Sci. of the United States of Am. 939 (2018) ("Offering [a] fee voucher increased naturalization application rates by about 41%, suggesting that application fees act as a barrier for low-income immigrants who want to become US citizens.").

47.     Because of the significant expense associated with naturalization, Congress has enacted a way for USCIS to provide services "without charge" to certain immigrants. *See* 8 U.S.C. § 1356(m).  In 2010, pursuant to that authority, USCIS set out the parameters of the fee waiver program under 8 C.F.R. section 103.7(c).  It states that to be eligible for a fee waiver, Applicants must be "unable to pay the prescribed fee."  8 C.F.R. § 103.7(c)(1)(i) (2020).  Additionally,

> To request a fee waiver, a person requesting an immigration benefit must submit a written request for permission to have their request processed without payment of a fee with their benefit request.  The request must state the person's belief that he or she is entitled to or deserving of the benefit requested, the reasons for his or her inability to pay, and evidence to support the reasons indicated.  There is no appeal of the denial of a fee waiver request.

*Id*. § 103.7(c)(2).

48.     Since the fee waiver program's implementation, fee waivers have played an important role in making naturalization accessible to many eligible LPRs.  According to researchers from the University of Southern California, approximately 32 percent of all naturalization-eligible adults qualify for a fee waiver based on income alone. *See* Manuel Pastor, Patrick Oakford & Jared Sanchez, Ctr. for the Study of Immigrant Integration & Ctr. for Am. Progress,  *Profiling    the    Eligible    to    Naturalize*    3    (Nov.    24,    2014), https://dornsife.usc.edu/assets/sites/731/docs/Report_Profiling-the-Eligible-to-Naturalize.pdf. Consistent with that statistic, almost 40 percent of naturalization applications filed in 2017 included a fee waiver request.

49.     Project Citizenship experiences an even higher percentage of fee waiver requests due to the low-income client population it serves – 73% of naturalization applications filed by Project Citizenship include a fee waiver request.

### 4.     The 2010 Notice and 2011 Policy Memorandum Regarding Fee Waivers

50.     In June 2010, USCIS published a notice to the Federal Register (the "2010 Notice"), attached as Exhibit ("Ex.") A, proposing changes to USCIS's fee waiver regulation for naturalization applications, 8 C.F.R. § 103.7(c).  U.S. Citizenship and Immigration Services Fee

Schedule, 75 Fed. Reg. 33,446 (proposed June 11, 2010) (to be codified at 8 C.F.R. pts. 103, 204, 244, 274A). Among other things, USCIS restructured the section "to list fees that can be waived, rather than those that cannot be waived." *Id.* at 33,478.

51.     In connection with the 2010 Notice, USCIS also created a form that Applicants could use to request a fee waiver. The form, known as Form I-912, was designed to "bring clarity and consistency to the fee-waiver process." U.S. Citizenship and Immigr. Servs., PM-602-0011.1, Policy Memorandum 2 (Mar. 13, 2011).

52.     In 2011, USCIS issued policy guidance clarifying how it would decide future fee waiver requests (the "2011 Policy Memorandum"), attached as Ex. B. *Id.* at 5-8. The 2011 Policy Memorandum set out three main ways in which Applicants could prove eligibility for a fee waiver.

53.     First, Applicants could submit proof that they currently receive a means-tested benefit, such as Medicaid, SSI, SNAP, or TANF. *Id.* at 5. These and other means-tested benefits are approved and offered by local government agencies to low-income individuals and families in order to ensure that they have access to the basic necessities of daily living. Receipt of a means-tested benefit was, therefore, determined to be a good indicator that an individual deemed unable to pay for daily needs such as food and medical care would similarly not be able to pay the fee required to become a U.S. citizen or obtain proof of U.S. citizenship. Applicants could easily provide valid proof of receipt of a means-tested benefits by means of a letter, notice, or other official document obtained directly from the benefit-granting agency. Once an Applicant proved that they were receiving a means-tested benefit, "the fee waiver w[ould] normally be approved, and no further information w[ould] be required." *Id.*

54.     Second, if an Applicant could not show proof of receipt of a means-tested benefit, they could still receive a fee waiver by proving that their income was "at or below 150 percent of the Federal Poverty Guidelines." *Id.* at 6. To do that, the 2011 Policy Memorandum requested evidence of the Applicant's wages, other sources of income, and, if available, federal tax returns. *Id.*

55.     Third, if an Applicant did not receive a means-tested benefit and could not prove that his or her income was at or below 150 percent of the Federal Poverty Guidelines, he or she could still demonstrate eligibility for a fee waiver by showing "financial hardship due to extraordinary expenses or other circumstances affecting his or her financial situation to the degree that he or she is unable to pay the fee," such as significant uninsured medical bills. *Id.* at 7. The

2011 Policy Memorandum directed employees evaluating financial hardship to consider proof of the Applicant's overall assets, liabilities, and expenses.  *Id.* at 7-8.

56.    As USCIS noted when it issued the 2011 Policy Memorandum, "the use of a USCIS-published fee-waiver request form is not mandated by regulation."  *Id.* at 2.  Fee waiver requests made without the use of Form I-912 were known as "applicant-generated" requests.  *Id.*

57.    An applicant-generated request required only a statement giving "the person's belief that he or she is entitled to or deserving of the benefit requested, the reasons for his or her inability to pay, and evidence to support the reasons indicated."  8 C.F.R § 103.7(c)(2).  Thus, Applicants were free to apply for a fee waiver without using the specific Form I-912 and could substitute a written reason and supporting evidence tailored to the Applicant's individual circumstances.

58.    The simplification and standardization of fee waiver applications after 2010 have had a significantly positive impact on rates of naturalization among low-income Applicants, non-English-speaking Applicants, and Applicants with lower education levels.  Analyzing federal immigration and census data, Stanford University researchers recently found that the introduction of Form I-912 increased the naturalization rate by about 1.5 percent.  Vasil Yasenov et al., *Standardizing the Fee-waiver Application Increased Naturalization Rates of Low-Income Immigrant*s, 116(34) Proceedings of the Nat'l Acad. of Sci. of the United States of Am. 16770 (2019).  It represents an estimated 75,318 low-income LPRs who were able to apply for and become citizens as a result of more standardized fee waiver access in 2013 alone.  *See id.*

59.    Ease of access to a fee waiver has had the greatest "impact on precisely those LPR groups who are most likely to be deterred by burdensome, complicated application processes" – including "households without an English speaker[], . . . immigrants in the lowest income [brackets,]" and "individuals with lower education levels." *Id.*

60.    Moreover – and most critically for Plaintiff – researchers believe that higher rates of naturalization are driven by the improved efficiency with which immigration service providers are able to navigate the administrative process of determining and documenting prospective Applicants' fee waiver eligibility. *See id.* at 16,770–71.  In fact, service provider assistance "is by far the most important predictor of fee waiver use." *Id.* at 16,771.  This detailed research underscores what Project Citizenship has learned from years of experience: if its ability to

effectively and efficiently serve clients is curtailed, the number of Form N-400 and Form N-600 applications will decrease—to the detriment of eligible LPRs, Derivative Applicants, and Plaintiff.

**B.     The 2019 Rule**

61.     On October 24, 2019, USCIS published a new Form I-912 (the "Revised Form I-912"), attached as Ex. C, for Applicants to use when making application fee waiver requests.  U.S. Citizenship and Immigr. Servs., OMB No. 1615-0116, Request for Fee Waiver (Oct. 24, 2019). On the following day, October 25, 2019, USCIS officially announced changes to the fee waiver process and eligibility criteria for Applicants seeking naturalization and other immigration benefits.  U.S. Citizenship and Immigr. Servs., PA-2019-06, Policy Alert (Oct. 25, 2019).  These announcements included a new policy alert, attached as Ex. D, and revisions to USCIS's policy manual.  *See id.*

62.     Together, the Revised Form I-912, the policy alert, and revisions to the policy manual (collectively, hereinafter the "2019 Rule") threatened to change the fee waiver process in a manner that would substantially reduce naturalization rates among the fee waiver-eligible population.

63.     Specifically, the 2019 Rule made three major changes to the naturalization application fee waiver process, all of which would reduce access to naturalization for low-income immigrants: (i) it eliminated fee waiver eligibility based on evidence of means-tested benefits; (ii) it required tax transcripts in lieu of tax returns to prove an Applicant's income; and (iii) it eliminated applicant-generated fee waiver requests.  The final implementation of these changes resulted in multiple lawsuits against USCIS and DHS, including one by Project Citizenship.  *See Project Citizenship, Inc. v. DHS*, No. 1:19-cv-12362 (D. Mass. filed Nov. 15, 2019); *N.W. Immigrant Rights Project v. USCIS*, No. 1:19-cv-03283 (D.D.C. filed Oct. 31, 2019); *City of Seattle v. DHS*, No. 3:19-cv-07151 (N.D. Cal. filed Oct. 29, 2019).  The court in *City of Seattle* issued a preliminary nationwide injunction against the application of USCIS's proposed fee waiver changes, finding that "(1) plaintiffs [were] likely to succeed on the merits of their claim that the 2019 Fee Waiver Revisions were established without compliance with the procedures required by the Administrative Procedure Act, [and] (2) plaintiffs [were] likely to suffer irreparable harm absent the requested relief" where they alleged that implementation of the 2019 Rule would jeopardize their funding and frustrate their mission of providing assistance to immigrants applying for naturalization.  *See City of Seattle v. DHS*, No. 3:19-cv-07151 (N.D. Cal. Dec. 11, 2019) (order

granting Plaintiff's motion for a preliminary injunction).  *City of Seattle* was stayed "pending the completion of the 2020 Rulemaking by [USCIS] announced in U.S. Citizenship and Immigration Servs. Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements." *See City of Seattle v. DHS*, No. 3:19-cv-07151 (N.D. Cal. Feb. 10, 2020) (order granting stipulated request to hold case in abeyance).  This court also granted a stay in *Project Citizenship, Inc.* pending the completion of the rulemaking process for the 2020 Rule.  *See Project Citizenship, Inc. v. DHS*, No. 1:19-cv-12362 (D. Mass. Feb. 12, 2020) (order granting joint motion to stay case and hold all proceedings in abeyance).

### C.      The 2020 Rule

64.      On November 14, 2019, USCIS published its notice of proposed rulemaking, U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements.  84 Fed. Reg. 62,280 (proposed Nov. 14, 2019) (to be codified at 8 C.F.R. pts. 103, 106, 204, 211-12, 214, 216, 223, 235-36, 240, 244-45, 245a, 248, 264, 274a, 301, 319-20, 322, 324, 334, 341, 343a, 343b, 392).

65.      According to USCIS, the "primary objective" of the fee review is to generate sufficient revenue to match its costs.  *Id.* at 62,282.  In its notice of proposed rulemaking, USCIS explains that its projected FY2019/2020 costs will be higher than its revenue and that achieving the full cost accounting that constitutes the primary objective of the fee review can only be done by reducing projected costs, using "carryover funds or revenue from the recovery of prior year obligations," or increasing fees.  *Id.* at 62,288.  USCIS represents that "reducing the projected costs to equal the projected revenue would risk degrading USCIS operations funded by the IEFA [or the "Immigration Examinations Fee Account"]," and a fee increase is therefore necessary.  *Id.*

66.      On August 3, 2020, USCIS published the final 2020 Rule in the Federal Register. 85 Fed. Reg. 46,788.  The 2020 Rule eliminates the ability of most low-income Applicants to apply for naturalization or to receive a certificate of citizenship in two critical ways.

67.      First, the 2020 Rule increases the application fee for Form N-400 by about 83% for paper filing, from $640 to $1,170, and by about 81% for online filing, from $640 to $1,160.  *Id.* at 46,792.  Prior to promulgating this rule, USCIS limited the Form N-400 application fee to "an amount less than its estimated costs and shift[ed] those costs to other fee payers."  *Id.* at 46,857. Now, under the "beneficiary-pays principle," USCIS will no longer limit Form N-400 fees.  *Id.* Instead, according to USCIS, the $1,170 fee for paper filing and the $1,160 fee for online filing

represent "the full cost of adjudicating the Form N-400, as well as the cost of similar service[s] provided without charge to asylum applicants and other immigrants." *Id.*

68.     Second, the 2020 Rule eliminates waived and reduced fees for most Applicants. *Id.* at 46,818, 46,913; *see supra* ¶ 12.  Under 8 C.F.R section 103.7(c)(2), USCIS previously waived application fees for Applicants who are unable to pay.  8 C.F.R § 103.7(c)(2).  In addition, under 8 C.F.R section 103.7(b)(1)(i)(BBB)(1), USCIS previously reduced application fees for Applicants with family incomes greater than 150 percent and not more than 200 percent of the Federal Poverty Guidelines.  8 C.F.R § 103.7(b)(1)(i)(BBB)(1) (2020).

69.      Among the costs that USCIS proposes to cover using newly generated fees are 1,960 new staff positions.  *See* 85 Fed. Reg. at 46,871.

### D.     Defendants' Promulgation of the 2020 Rule

70.     Defendants issued three notices for the 2020 Rule under the APA.

71.     USCIS first published its notice of proposed rulemaking in the Federal Register on November 14, 2019 (the "November 2019 Notice").  *See* 84 Fed. Reg. 62,280.  The November 2019 Notice directed interested parties to submit written comments "on or before December 16, 2019." *See id.*  On November 22, 2019, USCIS published supplemental information in the Federal Register, titled "Fee Rule – ECON Analysis 31OCT2019," which was a regulatory impact analysis.  *See* U.S. Citizenship and Immigr. Servs., CIS No. 2627-18, Regulatory Impact Analysis (Oct. 30, 2019).

72.     USCIS subsequently published two additional notices in the Federal Register extending the comment period.  USCIS published the second notice on December 9, 2019 (the "December 2019 Notice"), extending the comment period to December 30, 2019.  *See* U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, 84 Fed. Reg. 67,243 (proposed Dec. 9, 2019) (to be codified at 8 C.F.R. pts. 103, 106, 204, 211-12, 214, 216, 223, 235-36, 240, 244-45, 245a 248, 264, 274a, 301, 319-20, 322, 324, 334, 341, 343a, 343b, 392).

73.     USCIS published the third and final notice on January 24, 2020 (the "January 2020 Notice"), reopening the comment period until February 10, 2020.  *See* U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, 85 Fed. Reg. 4243 (proposed Jan. 24, 2020) (to be codified at 8 C.F.R. pts. 103, 106, 204, 211-12, 214, 216, 223, 235-36, 240, 244-45, 245a, 248, 264, 274a, 301, 319-20, 322,

324, 334, 341, 343a, 343b, 392).   In this notice, USCIS announced that it would "consider comments received during the entire public comment period, including comments received since December 30, 2019," after the initial public comment period closed.   *Id.*

74.     Individuals and organizations across the country submitted 43,108 comments to USCIS's notices.   85 Fed. Reg. at 46,794.   Comments submitted by immigrant rights groups and legal services organizations – including Plaintiff Project Citizenship – emphasized the devastating effect the rule change would have.

### 1.     The     Administrative     Procedure     Act's     Notice-and-Comment Rulemaking Procedures

75.     The APA requires an agency to follow a specific set of procedures before implementing a new or revised rule.   These procedures include a proposed rule, a comment period, and a final rule.

76.     First, notice-and-comment procedures require that a "[g]eneral notice of proposed rulemaking shall be published in the Federal Register."   5 U.S.C. § 553(b) (2018).

77.     Next, the agency must institute a comment period that "give[s] interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments."   *See id.* at § 553(c).   The opportunity for interested persons to comment must be meaningful.   *See Levesque v. Block*, 723 F.2d 175, 188 (1st Cir. 1983) (discussing the "right of interested persons to make their views known to the agency in time to influence the rule in a meaningful way"); *see also Pennsylvania v. Trump*, 930 F.3d 543, 568 (3d Cir. 2019).   In order to provide a meaningful opportunity to comment, an agency must give interested persons "enough time with enough information to comment."   *Prometheus Radio Project v. F.C.C.*, 652 F.3d 431, 450 (3d Cir. 2011).   Under Executive Order 12,866, "a meaningful opportunity to comment on any proposed regulations," in most cases, "should include a comment period of not less than 60 days." Exec. Order 12,866, 58 Fed. Reg. 51,735 (Sept. 30, 1993).

78.     At the end of the comment period, the agency "must consider and respond to significant comments received during the period for public comment," *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1203 (2015), and publish a final rule that includes a "concise general statement of [the rule's] basis and purpose."   5 U.S.C. § 553(c).

79.     Agencies must not be arbitrary and capricious when promulgating rules but "must examine the relevant data and articulate a satisfactory explanation for its action including a rational

connection between the facts found and the choice made.  In reviewing that explanation, [a court] must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Motor Veh. Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks and citations omitted).

80.    "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Id.*

81.    Additionally, agency rules must be "in accordance with law."   5 U.S.C. § 706(2)(A).  "If an agency action violates a regulation, it is 'not in accordance with law'" and must therefore be struck down.  *See Bradley v. Weinberger*, 483 F.2d 410, 414 n.2 (1st Cir. 1973) (internal citation omitted).

### E.    Defendants Were Required to Comply with the APA's Notice-and-Comment Rulemaking Procedures

82.    Rules typically must go through APA notice-and-comment rulemaking unless they are: "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice."  8 U.S.C. § 553(b)(A).

### 1.    The 2020 Rule is substantive, not interpretive

83.    The 2020 Rule is substantive because it alters the rights of individuals who would otherwise qualify to apply for citizenship.

84.    In contrast to an interpretative rule, a "substantive" rule affects "individual rights and obligations," and must go through APA notice-and-comment rulemaking.  *See Chrysler Corp. v. Brown*, 441 U.S. 281, 302 (1979).  This includes regulations that are "binding . . . [on] the agency and regulated parties, [and] also on the courts."  *Warder v. Shalala*, 149 F.3d 73, 82 (1st Cir. 1998).

85.    The 2020 Rule imposes binding substantive changes that affect Applicants' individual rights and obligations.  The rule prohibits many Applicants from submitting and obtaining fee waiver requests with their Form N-400 and Form N-600 applications, a right Applicants previously had under 8 C.F.R. section 103.7(c), and thus for many, impacting the right to apply for citizenship or proof of citizenship altogether.

-18-

2. **The 2020 Rule is not a general statement of policy, or a rule of agency organization, procedure, or practice**

86.     Nor is the 2020 Rule a general statement of policy, or rule of agency organization, procedure, or practice.  APA rulemaking was thus required.

87.     "[A] critical test of whether a rule is a general statement of policy is its practical effect in a subsequent administrative proceeding: a general statement of policy ... does not establish a binding norm .... it leaves the administrator free to exercise his informed discretion." *Greenwald v. Olsen*, 583 F. Supp. 1002, 1006 (D. Mass. 1984) (internal quotation marks and citations omitted).  In contrast, substantive rules are "binding norms intended to have the force of law, restraining the discretion of officials."  *Caribbean Produce Exch., Inc. v. Sec'y of Health & Human Servs.*, 893 F.2d 3, 7 (1st Cir. 1989); *see also Better Gov't Ass'n v. Department of State*, No. 83-2998, 1987 WL 8528, *2 (D.D.C. Mar. 9, 1987) (concluding that the Department of Justice needed to go through the APA rulemaking procedure when implementing binding changes to FOIA fee waiver regulations).

88.     The 2020 Rule removes any discretion from USCIS officers' evaluations of the fee waiver requests of most Applicants.  Except for in limited circumstances, Applicants can no longer request fee waivers, so there is no opportunity for officers to exercise discretion over such requests.

F.     **Defendants Did Not Comply with the APA's Notice-and-Comment Rulemaking Procedures**

1. **Defendants failed to provide the public with a meaningful opportunity to participate in the rulemaking process**

89.     Defendants failed to comply with the APA's notice-and-comment rulemaking procedures because they did not provide a comment period that gave interested persons a meaningful opportunity to participate in the rulemaking process.  *See* 5 U.S.C. § 553(c).

90.     Specifically, USCIS failed to provide interested parties with a meaningful opportunity to comment because USCIS did not provide enough time to comment on the 2020 Rule.

91.     Initially, on November 14, 2019, USCIS provided a comment period of only approximately 31 days, ending December 16, 2019.  84 Fed. Reg. at 62,280.  On November 22, USCIS posted its regulatory impact analysis, *see* U.S. Citizenship and Immigr. Servs., CIS No. 2627-18, Regulatory Impact Analysis (Oct. 30, 2019), but did not extend the existing comment

period.   On December 9, 2019, USCIS published its December 2019 Notice, which extended the comment period to December 30, 2019.  84 Fed. Reg. at 67,243.  Nearly one month later, on January 24, 2020, USCIS reopened the public comment period until February 10, 2020.  85 Fed. Reg. at 4243.  During this period, on February 3, 2020, "USCIS . . . hosted its first and only demonstration of [the] cost-modeling software" it used to calculate its proposed fee changes.  *See* The Immigrant Legal Resource Center, Comment Letter on U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements 4 (Feb. 10, 2020).  Thus, the public was afforded only approximately 55 days to comment on USCIS's November 22, 2019 economic analysis[1] and only approximately 7 days to comment on USCIS's cost modeling software, the foundation of its proposed fee changes.

92.     In the 2020 Rule, USCIS claims that it afforded the public a meaningful opportunity to comment in accordance with Executive Order 12,866 because it provided "a comment period of 61 days to review the [proposed rule], revised information collections, supporting documents, other comments, and the entire docket contents."  *See* 85 Fed. Reg. at 46,805.  However, given that the agency provided the public only approximately 55 days to comment on its November 22, 2019 economic analysis and only approximately 7 days to comment on its cost modeling software, this claim is false.

93.     Further, the 2020 Rule takes up 92 pages in the Federal Register and contains complex, quantitative analyses, which take substantial time and resources to understand.  As described above, this information was provided to the public in a piecemeal approach, with USCIS providing its economic analyses or pivotal supplemental information at least two different times. This approach failed to give the public sufficient time to conduct analysis and to comment on the complex information provided.  Thus, Plaintiff Project Citizenship and similarly situated organizations were not given a meaningful opportunity to participate in the rulemaking process. *See Prometheus Radio Project*, 652 F.3d at 450.

94.     USCIS's claim in its January 2020 Notice that it would "consider comments received . . . since December 30, 2019," *see* 85 Fed. Reg. at 4243, does not change the fact that it

---

[1] Under the December 2019 Notice, the public was given approximately 38 days to comment on this analysis, from November 22, 2019 to December 30, 2019.  *See* 84 Fed. Reg. at 67,243.  Then, under the January 2020 Notice, the public was given an additional 17 days to comment on this analysis, from January 24, 2020 to February 10, 2020.  *See* 85 Fed. Reg. at 4243.

failed to provide interested persons with a meaningful opportunity to comment on its proposed rule.  In fact, in its December 2019 Notice, USCIS made it clear that interested persons no longer had an opportunity to comment after December 30, 2019.  *See* 84 Fed. Reg. at 67,243 ("Mail must be postmarked by the comment submission deadline.").  Further, USCIS is not required to consider comments submitted outside of the public comment period.  *See Roosevelt Campobello Int'l Park Comm'n v. U.S. E.P.A.*, 684 F.2d 1041, 1046 (1st Cir. 1982) (rejecting Petitioners' argument that agency "failed to consider . . . alternative[s]" in part because Petitioners did not suggest these alternatives "during the comment period").  Interested persons thus had no reason to believe that any comments submitted between December 30, 2019 and January 24, 2020 would be considered by USCIS, and no reason to invest resources into submitting comments during this period.  Therefore, USCIS's choice to retroactively consider such comments does not render interested persons' opportunity to comment any more meaningful.

### 2. Defendants failed to adequately respond to the public's comments on the 2020 Rule

95.     Defendants failed to comply with the APA and acted arbitrarily and capriciously in promulgating the 2020 Rule because, despite the fact that thousands of comments were submitted in response to the Notices, Defendants' response to those comments was wholly deficient.

96.     All of the justifications Defendants provided for the 2020 Rule demonstrate clear error of judgment and failure to consider aspects of the problems raised in comments by Project Citizenship and other similarly situated groups.  Additionally, and relatedly, the 2020 Rule runs counter to the evidence presented in the comments.

97.     In particular, Defendants failed to substantively respond to three arguments made in comments submitted by Project Citizenship and similarly situated organizations: (i) Defendants need not raise fees and eliminate fee waivers for naturalization applicants and should instead explore ways of limiting operating costs in light of their exponential growth in recent years; (ii) the proposed fee changes will prevent most low-income applicants from accessing the naturalization process and effectively constitute a "wealth test;" and (iii) Defendants have failed to adhere to the "beneficiary-pays" principle that they claim justifies the 2020 Rule's proposed changes.

98.     First, Defendants failed to substantively respond to comments questioning their assertion that raising fees and eliminating fee waivers are necessary for USCIS to balance its

budget.  Numerous commenters suggested that Defendants explore ways of curbing inefficiencies or limiting ballooning costs before resorting to raising application fees to the detriment of the populations they serve.  *See* 85 Fed. Reg. at 46796, 46825.  Defendants effectively waved these comments away, vaguely promising to "continue to explore efficiencies that improve USCIS services" and possibly "incorporate corresponding cost savings into future biennial fee reviews and rulemakings" before ultimately declining to make changes based on those comments.  *Id.* at 46,881.

99.     Second, Defendants' responses significantly underestimate the burden that the 2020 Rule will place on Applicants.  Several comments cited studies establishing that naturalization fees prevent lower income Applicants from accessing citizenship and will inevitably drive down the volume of applications.  *Id.* at 46,818, 46,857, 46,859–60.  Others pointed out that, in order for lower income Applicants to afford the increased fees, they will either have to forego paying for necessities like food, shelter, healthcare, and education, or will have to go into debt.  *Id.* at 46,806. Defendants barely address these arguments and the data that supports them.  In several instances, they summarily state that "DHS does not agree that individuals will be prevented from filing applications or receiving immigrant benefits."  *Id*.  Elsewhere, they profess a belief that "most individuals will continue to value American citizenship, even if it is more expensive," *id.* at 46,858, and that "many LPRs will determine that the benefits of naturalization, including the prospect of additional earnings, exceed the cost of the fee for Form N-400[]."  *Id.* at 46,826.  Additionally, Defendants all but ignore numerous studies showing that the decision to apply for citizenship is highly price sensitive.  Instead of countering those studies with data of their own, Defendants rely on the assertion that "the proportion of LPRs naturalizing increased over time from the 1970s to 2004, despite the increase in the naturalization fee over that time period."  *Id.* at 46,860.

100.     Relatedly, Defendants' response to comments submitted by Plaintiff and other organizations that the proposed changes to the fee schedule constitute a "wealth test" for citizenship in violation of the INA was wholly deficient.  Defendants merely state that "[i]n adjusting the fees, DHS is not imposing a 'wealth test' or otherwise attempting to erect barriers to immigration and rejects any implication that its justifications for adjusting the fees are pretexts to obscure any other motivation."  *Id.* at 46,803.  Defendants failed entirely to respond to comments pointing out that an individual's financial means is not a requirement for citizenship under the INA.  *See id.* at 46,855.

101.    Third, Defendants failed to adequately respond to comments questioning their adherence to the "beneficiary-pays" principle that they claim justifies changes to N–400 and other fees.  Several commenters pointed to "measurable hypocrisy" insofar as USCIS maintained fee caps and subsidies for certain forms and applicants, despite its newfound insistence on using the "beneficiary-pays" principle to set fees generally.  *See id.* at 46,801-02.  Indeed, Defendants even admit that "[i]n certain instances, DHS deviates from the beneficiary-pays principle to establish fees that do not represent the estimated full cost of adjudication."  *Id.* at 46,795.  With respect to form N–400 fees specifically, commenters noted that the 2020 Rule proposes to "charg[e] naturalization applicants a higher amount than the cost of processing of their own applications, subsidizing other immigration-related expenditures."  *Id.* at 46,857.  In response, Defendants claim that "the fee for Form N–400 reflects not only the direct costs of processing an individual Form N–400 filing but also the cost of providing similar services at no or reduced charge to asylum applicants and other immigrants."  *Id.* at 46,858.  Despite this, Defendants profess to believe that it would not be "equitable . . . to continue to force certain other applicants to subsidize fee-waived and reduced-fee applications for naturalization applicants who are unable to pay the full cost fee." *Id.*  Defendants fail to account for how they can claim to adhere to the beneficiary-pays principle to set fees generally, while deviating from it with respect to naturalization fees specifically.

102.    In general, Defendants demonstrated a refusal to sincerely consider comments or adjust the 2020 Rule to account for the evidence presented by Project Citizenship and others. Defendants' foregone approach to promulgation of the 2020 Rule clearly did not satisfy the APA's notice-and-comment rulemaking procedures.

### G.    Defendants' 2020 Rule is Arbitrary and Capricious

103.    The 2020 Rule is also unlawful because it is arbitrary and capricious, in violation of the APA.  *See* 5 U.S.C. § 706(2)(A).  An agency action is arbitrary and capricious if the agency fails to "give adequate reasons for its decisions," *Encino Motorcars LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016), "explain the evidence which is available," "examine the relevant data," or "offer a rational connection between the facts found and the choices made."  *State Farm*, 463 U.S. at 43, 52 (internal quotation marks omitted).  "An agency must cogently explain why it has exercised its discretion in a given manner."  *See id.* at 48.

104.    Defendants failed to adhere to this standard in many instances.  First, the 2020 Rule is not tailored to its stated rationale.  Defendants claim that raising the citizenship fee and

eliminating fee waivers are necessary measures to generate sufficient revenues to match operating costs. *See* 85 Fed. Reg. at 46,789. Defendants allege that citizenship application fees have historically been discounted heavily, with the costs of processing citizenship applications shifted to other fee payers. *Id.* at 46,857. Under the 2020 Rule, USCIS will "no longer limit the Form N-400 fee, thereby mitigating the fee increase of other immigration benefit requests." *Id.* According to Defendants, the fee changes merely reflect a shift from the "ability-to-pay" principle, in which "those who are more capable of bearing the burden of fees should pay more for the service than those with less ability to pay," to the "beneficiary-pays" principle, in which "the beneficiaries of a service pay for the cost of providing that service." 84 Fed. Reg. at 62,298.

105.    But, as USCIS admits, the 2020 Rule "deviates from the beneficiary-pays principle to establish fees that do not represent the estimated full cost of adjudication." 85 Fed. Reg. at 46,795. Further, Defendants' concession is not surprising in light of the agency's own data revealing that the proposed fee increase would result in Applicants paying for more than the cost of processing their applications. Applicants, therefore, will be subsidizing the costs of processing other types of immigration benefits applications. According to USCIS, the cost of processing an N-400 application for FY2018/2019 is $985 per application. 84 Fed. Reg. at 62,317. Yet Defendants propose to charge naturalization applicants $1,170 for paper filing, a fee that is $185 or 19% higher than the cost to the agency of each application. *See id.* In fact, Defendants expressly acknowledge that this fee covers "the full cost of adjudicating the Form N-400, *as well as* the cost of similar service[s] provided without charge to asylum applicants and other immigrants." 85 Fed. Reg. at 46,857 (emphasis added). The 2020 Rule does not set application fees under the "beneficiary-pays" principle, but instead relies on Form N-400 fee payers to provide extra revenue that Defendants could use to subsidize other applicants or initiatives.

106.    Second, Defendants rely on inadequate and unsound data to support their projections regarding both the number and cost of future applications. USCIS projects an increase in N-400 applications for FY2019/2020 from roughly 830,000 to 913,500, with an increase in fee-paying applications from roughly 632,000 to 812,000. 84 Fed. Reg. at 62,290-91. As an initial matter, it is unclear how Defendants can project over 10% of the N-400 applications in FY2019/2020 to be non-fee-paying applications, given their proposal to remove the fee waiver and reduced fees for N-400 applications. But Defendants also fail to explain how they project a large increase in N-400 applications at the same time the 2020 Rule implements a drastic fee

increase.  Defendants summarily assert that "DHS does not anticipate a reduction in receipt volumes because of the fee waiver policy changes," 85 Fed. Reg. at 46,807, and assume that, if needed, Applicants will "save, borrow, or use a credit card in order to pay fees."  *Id.* at 46,881. But such an assumption contradicts multiple studies finding that the decision to pursue citizenship is highly price sensitive.  *See infra* nn.2-3 and accompanying text.

107.    In short, USCIS has provided only inconsistent, unsupported, and facially irrational justifications for the changes subsumed within the 2020 Rule in violation of the APA.

### H.    The 2020 Rule Conflicts with the Immigration and Nationality Act

108.    Agency actions must be struck down when they are "not in accordance with law." 5 U.S.C. § 706(2)(A).  The revisions embodied in the 2020 Rule are directly contrary to several sections of the INA and, therefore, are not in accordance with law.

109.    By creating a wealth requirement for citizenship, the 2020 Rule is not in accordance with sections 312 and 316 of the INA, which enumerate the prerequisites for naturalization.  *See* 8 U.S.C. §§ 1423, 1427.  Those criteria, set by Congress, include demonstration of good moral character; a minimum number of years of lawful permanent residence; physical presence within the United States for a certain period of time; proficiency in the English language; and basic knowledge of the nation's history and government.  *See id.*  Income, wealth, economic, and even employment status are conspicuously absent.

110.    But the 2020 Rule's 83% fee hike and effective elimination of the fee waiver and reduced fee programs promise to price most individuals out of citizenship, creating a *de facto* wealth requirement.  It is well established that application fees are a barrier to citizenship.[2]  Indeed, research has shown that historical increases in application fees for naturalization have priced out

---

[2]  *See, e.g.*, Vasil Yasenov et al., *Standardizing the Fee-Waiver Application Increased Naturalization Rates of Low-Income Immigrants*, 116(34) Proceedings of the Nat'l Acad. of Sci. of the United States of Am. 16772 (2019) ("[D]ifficulties accessing the fee waiver are barriers to citizenship for low-income LPRs."); Jens Hainmueller et al., *A Randomized Controlled Design Reveals Barriers to Citizenship for Low-Income Immigrants*, 115(5) Proceedings of the Nat'l Acad. of Sci. of the United States of Am. 939 (2018) (finding that "offering [fee vouchers that cover the cost of the application fee] increased naturalization applications rates by about 41%, suggesting that application fees act as a barrier for low-income immigrants who want to become US citizens . . . ."); Ana Gonzalez-Barrera et al., *The Path Not Taken: Two-thirds of Legal Mexican Immigrants Are Not U.S. Citizens*, Pew Research Center 6 (Feb. 4, 2013) (finding that 18% of Latino lawful permanent residents surveyed cited financial and administrative barriers as one of the main reasons they had not naturalized).

lower income and less educated immigrants.[3]   Further, while the 2020 Rule includes limited exceptions to the elimination of fee waivers, *see supra* ¶ 12, the LPRs that benefit from these exceptions make up only a small portion of the total LPRs eligible to naturalize.   For example, in 2018, only 31,168 individuals obtaining LPR status fell within these exceptions.[4]   In contrast, almost 1.1 million individuals obtained LPR status that year in total.   Dep't Homeland Sec., Table 7. Persons Obtain Lawful Permanent Resident Status by Type and Detailed Class of Admission: Fiscal Year 2018, https://www.dhs.gov/immigration-statistics/yearbook/2018/table7 (last updated Jan. 16, 2020).   Thus, only about 2.8% of individuals obtaining LPR status in 2018 could be eligible to apply for a Form N-400 fee waiver under the 2020 Rule's limited exceptions. Accordingly, 97.2% of low-income immigrants who are eligible for citizenship would be seriously impacted by the fee increases and the removal of fee waiver and reduced fee options under the 2020 Rule.   Effectively, all but the wealthiest applicants would be barred from applying for citizenship.   By creating a wealth requirement, the 2020 Rule violates the plain language of sections 312 and 316 of the INA.   *See* 8 U.S.C. §§ 1423, 1427.

## V.   PLAINTIFF IS HARMED BY DEFENDANTS' 2020 RULE

111.   Plaintiff Project Citizenship provides legal assistance to low-income immigrants who are eligible to naturalize or to receive a certificate of citizenship and would not otherwise be able to afford an attorney to guide them through the complicated process.   For years, Plaintiff has designed and administered programs to assist applicants to complete fee waiver paperwork along with their applications – complex tasks for which legal assistance is often required.   The 2020 Rule

---

[3] Manuel Pastor et al., *Nurturing Naturalization: Could Lowering the Fee Help?*, Center for the Study of Immigrant Integration 17 (Feb. 2013) ("[T]he price increases for naturalization in 2004 and 2007 are a significant barrier to citizenship for less educated and lower income immigrants . . . .").

[4] Under the 2020 Rule, USCIS will allow Violence Against Women Act self-petitioners, victims of human trafficking, victims of crime, Special Immigrant Juveniles, special immigrant interpreters who are nationals of Iraq or Afghanistan, and special immigrant Iraqis and Afghans employed by the U.S. government to submit fee waiver requests.   85 Fed. Reg. 46,790, 46,810, 46,920. According to DHS, in FY2018, 58 Violence Against Women Act self-petitioners, 1,208 victims of human trafficking, 15,012 victims of crime, 4,547 Special Immigrant Juveniles, 46 special immigrant interpreters who are nationals of Iraq or Afghanistan, and 10,297 special immigrant Iraqis and Afghans employed by the U.S. government obtained lawful permanent resident status.   Dep't Homeland Sec., Table 7. Persons Obtain Lawful Permanent Resident Status by Type and Detailed Class of Admission: Fiscal Year 2018, https://www.dhs.gov/immigration-statistics/yearbook/2018/table7 (last updated Jan. 16, 2020).

will jeopardize Project Citizenship's primary source of funding and significantly impair its ability to achieve its mission, thereby preventing thousands of Project Citizenship's clients from becoming citizens and depriving them of the benefits of citizenship. *See supra* ¶¶ 33-37.

### A.    The 2020 Rule jeopardizes Plaintiff's funding

112.    First, Project Citizenship is harmed because the 2020 Rule will immediately jeopardize its funding.

113.    Project Citizenship's entire revenue stream consists of grants and donations from foundations, corporations, and individuals.  In order to receive these grants and donations, Project Citizenship must serve low-income clients and report the number of individuals served. Accordingly, Project Citizenship's applications, proposals, and request letters state the minimum number of individuals Project Citizenship is expected to serve annually.  Grant proposals submitted for funding have historically predicted outcomes of at least 1,500 citizenship applications per year based on patterns of productivity over the past several years.

114.    Project Citizenship's model is based upon serving a high volume of Applicants, and Project Citizenship's ability to reach its current fundraising targets will be jeopardized if the volume of applications it submits plummets.  Project Citizenship assisted 1,974 legal permanent residents in filing for naturalization in 2019; 1,575 in 2018; 1,628 in 2017; and 1,504 in 2016. Approximately 71% of those applications were submitted with a request for a fee waiver.

115.    The elimination of fee waivers and the increased application fee will significantly reduce the number of Applicants that Project Citizenship can serve.  Although the number of immigrants interested in citizenship is likely to stay consistent or grow, the number of Applicants who can afford to pay the increased and not waivable citizenship fees will be greatly diminished.  2018 statistics suggest at least 97.2% of LPRs will be not be eligible to apply for a fee waiver.  As a result, Plaintiff will not be able to serve as many applicants as it has promised funders, potentially putting it in breach of its current grant obligations and making it a less attractive investment for future funding.

116.    Plaintiff also receives a significant amount of revenue in the form of corporate and law firm donations.  These donations are given primarily in recognition of the opportunities that Plaintiff provides for attorneys at these organizations to participate in *pro bono* services such as citizenship workshops for low-income clients.  But a reduced number of clients served will inevitably mean that Plaintiff is not able to provide the same volume and quality of *pro bono*

opportunities.  As a result, Plaintiff anticipates that these organizations will decline future donation requests.

        **B.**      **The 2020 Rule Will Frustrate Project Citizenship's Mission**

       117.    More generally, the elimination of the fee waiver and the increased application fee will frustrate Plaintiff's mission to provide a path to citizenship for all regardless of ability to pay the requisite application fees.  As explained above, these changes will discourage immigration and deter LPRs from becoming citizens, *see supra* nn.2-3 and accompanying text, including the over 70% of Project Citizenship's clients who cannot afford to submit their applications without a waived or reduced filing fee.  The economic reality for many of Project Citizenship's clients has only worsened as a result of the COVID-19 pandemic, and an increased percentage of Project Citizenship's clients are now unemployed.   The 2020 Rule will therefore fundamentally undermine, and potentially outright defeat, Plaintiff's mission of providing access to legal services for individuals who cannot afford to hire individual private attorneys to guide them through the complex and legally fraught process of naturalization.  By defeating Project Citizenship's mission, the 2020 Rule will deprive thousands of its clients of the benefits of naturalization, including economic opportunities and the right to vote.  *See supra* ¶¶ 33-37.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

#### (Defendants Failed to Comply with Procedures Required by the Administrative Procedure Act)

       118.    Plaintiff repeats and incorporates by reference the preceding allegations.

       119.    USCIS is subject to the APA.  *See* 5 U.S.C. §§ 551(1), 553; *see also* 5 U.S.C. § 703 (2018).

       120.    The APA was "adopted to provide, inter alia, that administrative policies affecting individual rights and obligations be promulgated pursuant to certain stated procedures so as to avoid the inherently arbitrary nature of unpublished ad hoc determinations." *Morton v. Ruiz*, 415 U.S. 199, 232 (1974).  Indeed,

> [The] agency power to make rules that affect substantial individual rights and obligations carries with it the responsibility not only to remain consistent with the governing legislation, but also to employ procedures that conform to the law.  No

> matter how rational ... a particular decision might be, the determination of eligibility
> cannot be made on an ad hoc basis by the dispenser of the funds.

*Id.* (internal citations omitted). All rules that are "substantive" and affect "individual rights and obligations"— that is, regulations that are "binding . . . [on] the agency and regulated parties, [and] also on the courts," *Warder*, 149 F.3d at 82 – must go through APA notice-and-comment rulemaking. *See Chrysler Corp.*, 441 U.S. at 302.

121.    Notice-and-comment rulemaking procedures under the APA require: (1) that "[g]eneral notice of proposed rulemaking shall be published in the Federal Register," 5 U.S.C. § 553(b); (2) that "the agency ... give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments," *id.* at § 553(c); (3) that the agency "consider and respond to significant comments received during the period for public comment," *Perez*, 135 S. Ct. at 1203; and (4) that the final published rule include "a concise general statement of [the rule's] basis and purpose." 5 U.S.C. § 553(c).

122.    The agency must give interested persons a meaningful opportunity to comment. *See Levesque*, 723 F.2d at 188; *see also Pennsylvania*, 930 F.3d at 568. Specifically, an agency must provide "enough time with enough information to comment." *Prometheus Radio Project*, 652 F.3d at 450.

123.    Following the submission of comments, the agency must then respond to those comments. "In order for an agency decision to pass muster under the APA[] … the decision [must be] 'rational' [and] 'make[] … sense.'" *Penobscot Air Servs., Ltd. v. F.A.A.*, 164 F.3d 713, 720 (1st Cir. 1999) (internal citations omitted). "The requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result . . . and 'respond to 'relevant' and 'significant' public comments.'" *Id.* at 719 n.3 (internal citations omitted). Therefore, "agency decisions [must be] founded on reasoned evaluation of the relevant factors." *Id.* at 720. In the rulemaking process, an agency official cannot "shut his mind to other ideas" and must "remain[] open to persuasion." *S. Terminal Corp. v. E.P.A.*, 504 F.2d 646, 675 (1st Cir. 1974).

124.    The 2020 Rule is substantive and affects individual rights and obligations.

125.    Defendants failed to provide interested persons with a meaningful opportunity to comment. They published complex economic analyses regarding their fee determinations and supplemented that information over the course of the comment period. This piecemeal approach

failed to give Plaintiff Project Citizenship and similarly situated organizations sufficient time to conduct analysis and to comment on the complex information provided.

126.    Defendants failed to adequately respond to comments submitted by Plaintiff and similarly situated organizations.  They summarily dismissed comments suggesting that DHS consider addressing its own inefficiencies and growing costs before imposing those costs on the public in the form of fee increases.  Defendants also virtually ignored data presented by numerous commenters that the proposed changes will have a severe negative effect on lower income Applicants and effectively constitute a "wealth test" for citizenship.  Finally, Defendants fail to reconcile inconsistencies between the "beneficiary-pays" principle, which they claim justifies the proposed changes, and the fact that naturalization applicants will be required to pay more than the cost of adjudicating their applications, in effect subsidizing other applicant categories.

127.    Accordingly, the 2020 Rule was issued "without observance of procedure required by law" and is invalid under 5 U.S.C. § 706(2)(D).

## SECOND CAUSE OF ACTION

### (The 2020 Rule is Substantively Arbitrary and Capricious and Otherwise Not in Accordance with the Law in Violation of the Administrative Procedure Act)

128.    Plaintiff repeats and incorporates by reference the preceding allegations of this Complaint.

129.    The 2020 Rule is a final agency action subject to judicial review because it "marks the consummation of the agency's decisionmaking process" and is "one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'"  *Bennett v. Spear*, 520 U.S. 154, 156, 178 (1997) (quoting *Port of Bos. Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)).

130.    An agency action is arbitrary and capricious where an agency failed to "give adequate reasons for its decisions," "explain the evidence which is available," "examine the relevant data," or offer a "rational connection between the facts found and the choice made." *Encino Motorcars, LLC*, 136 S. Ct. at 2125; *State Farm*, 463 U.S.at 43, 52 (1983).

131.    The 2020 Rule is arbitrary and capricious and violates the APA for several reasons.

132.    Defendants have failed to "cogently explain why [they have] exercised [their] discretion in a given manner."  *State Farm*, 463 U.S. at 48–49.  Specifically, the 2020 Rule is not tailored to its stated rationale.

133.     Defendants assert, as a basis for the 2020 Rule, that citizenship fees have historically been heavily discounted, with the costs of processing citizenship applications shifted to other fee payers.  Defendants claim that the fee changes reflect a shift from the "ability-to-pay" principle to the "beneficiary pays" principle, in which "the beneficiaries of a service pay for the cost of providing that service."  84 Fed. Reg. at 62,298.  But Defendants' own data suggest that the proposed fee changes would in fact result in naturalization applicants subsidizing the costs of *other* immigration benefits applicants or government initiatives.

134.     Defendants' stated rationale is an unsubstantiated and pretextual justification that conceals the agency's true purpose, which is to limit access to naturalization and thereby deprive those eligible for naturalization of political rights, including the right to vote.

135.     Defendants have also failed to examine the relevant data.  Defendants project an increase in N-400 applications of approximately 180,000 for FY 2019/2020 while simultaneously implementing a drastic fee increase and summarily assert that they do not anticipate any changes in the volume of N-400 applications as a result of the fee increase or elimination of fee waivers.  But empirical studies have shown time and again that high fees are a significant barrier to citizenship for low-income applicants.

136.     The 2020 Rule is not in accordance with the law because it creates a *de facto* wealth requirement for citizenship that is contrary to the plain language of sections 312 and 316 of the INA.  *See* 8 U.S.C. §§ 1423, 1427.

137.     8 U.S.C. §§ 1423 and 1427 are unambiguous.  They list the requirements for naturalization, including English language proficiency, knowledge and understanding of the fundamentals of United States history and government, continuous residence and physical presence in the United States for a prescribed period, and good moral character.  *See id.*  The statute does not contemplate, let alone require, wealth or ability to pay.  Defendants' 2020 Rule contradicts the plain language of the statute.

138.     Accordingly, the 2020 Rule is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and is invalid under 5 U.S.C. § 706(2)(A).

## **REQUEST FOR RELIEF**

For the foregoing reasons, Plaintiff requests that the Court:

a) Declare that the 2020 Rule is unlawful;

b) Vacate the 2020 Rule;

c) Enjoin Defendants from enforcing or applying any aspect of the 2020 Rule;

d) Grant Plaintiff its costs in this action, including reasonable attorneys' fees incurred; and

e) Award other relief that the Court deems just and proper.

Dated:  August 17, 2020

Ropes & Gray LLP

By: /s/ Amy D. Roy
      Amy D. Roy (MA Bar No. 669427)
      amy.roy@ropesgray.com
      Alex E. Intile (MA Bar No. 696474)
      alex.intile@ropesgray.com
      Gregory A. Hardy (MA Bar No. 705433)
      gregory.hardy@ropesgray.com
      Matthew P. Carrieri (MA Bar No. 705192)
      matthew.carrieri@ropesgray.com
      Stephanie A. Fagan (MA Bar No. 705329)
      stephanie.fagan@ropesgray.com
      Prudential Tower
      800 Boylston Street
      Boston, MA 02199-3600
      Telephone:  (617) 951-7000